UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| The Arnold Engineering Co.,<br><br>Plaintiff,<br><br>v.<br><br>Liberty Mutual Insurance Company,<br><br>Defendant. | Case No.<br><br>**JURY TRIAL REQUESTED** |

## **COMPLAINT**

Plaintiff, The Arnold Engineering Co. ("Plaintiff" or "Arnold"), by and through its attorneys, for its Complaint against Liberty Mutual Insurance Company ("Defendant" or "Liberty Mutual"), alleges, on knowledge as to its own actions, and otherwise upon information and belief, as follows:

**Preliminary Statement**

1. This coverage litigation stems from Liberty Mutual's denial of indemnity coverage to Arnold for costs incurred by Arnold in complying with remediation required by the Illinois Environmental Protection Agency ("IEPA") pursuant to the Illinois Environmental Protection Act ("Act").

2. Arnold is entitled to coverage under a series of historic commercial general liability insurance policies issued by Liberty Mutual during the 1970s and 1980s.

3. In denying coverage, Liberty Mutual has raised the potential application of various pollution exclusions, among other issues.

4. These exclusions do not apply, however, where the alleged pollution was a permitted activity, where the damages alleged fall under the policies' personal injury coverage

1

grants, or where the carrier has not met its burden to demonstrate that the alleged pollution was expected and intended.

5. As a result of Liberty Mutual's refusal to satisfy its indemnification obligations under the policies, Arnold must fund remediation costs likely to exceed $4 million.

## Jurisdiction

6. This Court has jurisdiction over this action pursuant to 20 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of Illinois on the one hand, and a citizen of Massachusetts on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## Venue

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), in that the sole Defendant in this matter is a resident of the State of Massachusetts by virtue of Defendant's principal place of business.

## Parties

8. The Arnold Engineering Co. is a corporation that is incorporated in Illinois and has its principal place of business in Illinois. Therefore, Plaintiff is a citizen of Illinois for the purposes of diversity jurisdiction.

9. Upon information and belief, Liberty Mutual Insurance Company is a corporation that is incorporated in Massachusetts and has its principal place of business in Massachusetts. Therefore, Defendant is a citizen of Massachusetts for the purposes of diversity jurisdiction.

**Facts**

**A.     The 300 West Site**

10.     Arnold's business consists of producing permanent "alnico" magnets made primarily from an alloy of aluminum, nickel and cobalt (Al-Ni-Co).

11.     Arnold's historic manufacturing operations, which are the subject of the environmental claims underlying this coverage dispute, were conducted at a property located at 300 North West Street in Marengo, Illinois (the "Site").

12.     From approximately 1946 through 1986, Arnold's parent company, Allegheny Ludlum Steel Corporation, Inc. (later known as Allegheny International, Inc.), owned the Site, and Arnold operated its manufacturing facility on the premises.

13.     In 1986, SPS Technologies, Inc. ("SPS") purchased Arnold from Allegheny International, Inc.

14.     From approximately 1986 through 2003, SPS owned the Site and operated Arnold's business at the Site. In 2003, Precision Castparts Corp. acquired SPS and continued to own the Site and operate Arnold's business until 2005.

15.     In 2005, SPS placed the Site into a separate entity named the "300 N. West Street, LLC" (a Delaware LLC), and entered into a lease with Arnold to operate on the Site. At about the same time, SPS sold Arnold's business to a private equity fund that operated Arnold until 2012.

16.     In 2006, 300 N. West Street LLC sold the Site to John Daley & Associates, LLC, which immediately assigned the Site to 300 West LLC (an Illinois limited liability company), the current owner of the Site.

17. As part of its purchase agreement, 300 West LLC agreed to enter the Site into the Illinois voluntary cleanup program and obtain a finding of "no further remediation" from the IEPA.

18. 300 West LLC assumed the lease of the Site and continued to lease to Arnold until December 31, 2024.

19. In 2012, Arnold was sold to its current owners, and Arnold continued to lease the Site from 300 West LLC until December 2024.

20. In December 2024, Arnold moved its manufacturing operations from the Site and currently conducts its operations in Woodstock, Illinois.

**B.    The Environmental Claims**

21. On February 28, 2008, the IEPA issued a violation notice to Arnold due to alleged chlorinated solvent groundwater contamination both at the Site and migrating off the Site to neighboring properties.

22. On June 14, 2013, the attorney general for the State of Illinois, at the request of the IEPA, filed suit against Arnold and 300 West LLC (the "IEPA Suit").

23. The IEPA Suit contained three counts against Arnold pertaining to its operations at the Site.

24. Specifically, the State alleged the following claims: Substantial Danger to the Environment, Public Health and Welfare in violation of Section 43(a) of the Act, 415 ILCS 5/43(a), Water Pollution in violation of Section 12(a) of the Act, 415 ILCS 5/12(a), and Cost Recovery pursuant to Section 22.2(f) of the Act, 415 ILCS 5/22.2(f).

25. Separately, Arnold was named as a defendant in at least two lawsuits brought by Illinois residents living near the Site.

26.     Following a series of injunction orders, on June 1, 2016, Arnold and 300 West LLC entered into a "Consent Order" with the State of Illinois to address the claims alleged in the IEPA Suit (the Consent Order is attached as Exhibit 1).

27.     Arnold's entry into the Consent Order was not and is not an admission of liability with respect to the claims brought in the IEPA Suit.

28.     Pursuant to the Consent Order, Arnold and 300 West LLC were released from liability for the claims brought in the IEPA Suit in exchange for which Arnold and 300 West LLC agreed to be jointly and severally liable for completing the remediation projects detailed therein and to pay approximately $100,000.00 to the IEPA and Attorney General's office.

29.     The Consent Order required Arnold and 300 West LLC to: (1) provide bottled water to certain private water well owners; (2) conduct soil, water, groundwater and private well sampling and analysis pursuant to IEPA standards; (3) fund and perform the hook-up of certain properties to municipal water lines (including obtaining agreements with the municipality); (4) pay for IEPA oversight costs, and (5) draft, submit, and execute a remediation plan, among other actions.

30.     The total costs associated with compliance with the IEPA's remediation requirements as set forth in the Consent Order are estimated to exceed $4 million.

31.     The court has entered at least eight amendments to the Consent Order, with the most recent being entered in December 2020.

32.     By letter of January 31, 2025, 300 West LLC advised Arnold that 300 West LLC would not conduct future work at the Site and demanded Arnold pay for past costs performing investigation and remediation activities at the Site until Arnold's payments match those already made by 300 West LLC (the "January 2025 Letter" is attached as Exhibit 2).

**C.      The Liberty Policies**

33.     Liberty Mutual issued comprehensive general liability ("CGL") policies to Allegheny Ludlum Industries, Inc. for successive policy periods beginning no later than January 1, 1976, through January 1, 1978, and from July 1, 1978 to July 1, 1980.

34.     Liberty Mutual also issued CGL policies to Allegheny International, Inc. for successive periods from January 1, 1980 to July 1, 1988.

35.     Liberty Mutual also issued a CGL policy to SPS Technologies, Inc. for the policy period beginning October 1, 1986, and ending October 1, 1987 (together, with the CGL policies issued to Allegheny Ludlum Industries, Inc. and Allegheny International, Inc., the "Liberty Policies").

36.     The policy numbers and policy periods for each of the Liberty Policies known to Arnold and in Arnold's possession at this time are attached as Exhibits 3–13 as follows:

| Exhibit No. | Policy No. | Policy Period |
|---|---|---|
| Exhibit 3 | LG1-681-004050-046 | 01/01/1976–01/01/1977 |
| Exhibit 4 | LG1-681-004050-047 | 01/01/1977–01/01/1978 |
| Exhibit 5 | LG1-681-004050-128 | 07/01/1978–07/01/1979 |
| Exhibit 6 | LG1-681-004050-129 | 07/01/1979–07/01/1980 |
| Exhibit 7 | LG1-681-004050-120 | 07/01/1980–07/01/1981 |
| Exhibit 8 | LG1-681-004050-121 | 07/01/1981–07/01/1982 |
| Exhibit 9 | LG1-681-004050-122 | 07/01/1982–07/01/1983 |
| Exhibit 10 | LG1-681-004050-123 | 07/01/1983–07/01/1984 |
| Exhibit 11 | LG1-681-004050-124 | 07/01/1984–07/01/1985 |
| Exhibit 12 | LG1-681-004050-125 | 07/01/1985–07/01/1988 |

| Exhibit 13 | LG1-131-029075-036 | 10/01/1986–10/01/1987 |

37.  Arnold is an insured under each of the Liberty Policies. Exhibit 8 at 4.[1]

38.  The Liberty Policies include insuring agreements under which Liberty Mutual agreed as follows:

> The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of
>
> Coverage A. **bodily injury** or
> Coverage B. **property damage**
>
> to which this policy applies, caused by an **occurrence**, and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Exhibit 8 at 57 (emphasis in original, identifying defined terms).

39.  Liberty Mutual has cited certain exclusions found within some of the Liberty Policies to justify its denial of coverage, including:

> **Exclusions**
>
> This policy does not apply:
>
> ***
>
> (f)  to **bodily injury** or **property damage** arising out of the discharge, dispersal release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal,

---

[1] Many of the Liberty Policies are substantially similar with respect to their relevant terms. Therefore, unless otherwise noted herein, quotes to the language of the Liberty Policies will be taken from Liberty Mutual policy number LG1-681-004050-121 found at Exhibit 8.

7

release or escape is sudden and accidental [hereinafter, the "Sudden and Accidental Pollution Exclusion"];

\*\*\*

(k)     to **property damage** to:

        (1)     property owned or occupied by or rented to the **insured**,
        (2)     property used by the **insured**, or
        (3)     property in the care, custody or control of the **insured** or as to which the insured is for any purpose exercising physical control.

Exhibit 8 at 57.

40.     The Liberty Policies include the following defined terms:

"**bodily injury**" means bodily injury, sickness or disease sustained by any person, which occurs during the policy period, including death at any time resulting therefrom;

\*\*\*

"**insured**" means any person or organization qualifying as an insured in the "Person Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit it brought, except with respect to the limits of the company's liability;

\*\*\*

"**named insured**" means the person or organization named in Item 1 of the declarations of the policy;

\*\*\*

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

\*\*\*

"**property damage**" means (1) physical injury to or destruction of tangible property, which occurs during the policy period, including loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

8

Exhibit 8 at 59.

43. In addition to the language common between the Liberty Policies, some of the policies include endorsements that purport to modify and/or alter the language for that policy.

42. For example, policy number LG1-131-029075-036, effective during the policy period October 1, 1986, through October 1, 1987, includes Endorsement 53, which deletes the pollution exclusion found in Endorsement 46 of the Liberty Policies. Exhibit 13 at 65, 74.

43. Policy number LG1-131-029075-036 includes personal injury coverage pursuant to the following provision:

> II. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY COVERAGE
>
> (A) The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury to which this insurance applies, sustained by any person or organization and arising out of the conduct of the named insured's business, within the policy territory, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury, even if any of the allegations are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Exhibit 13 at 12.

44. Policy number LG1-131-029075-036 defines "personal injury" as "injury arising out of one or more of the following offenses committed during the policy period: . . . wrongful entry or eviction or other invasion of the right of private occupancy." Exhibit 13 at 13.

**D. The Coverage Dispute**

9

45. On July 12, 2019, shortly after receiving evidence that Liberty Mutual issued commercial general liability insurance policies to historic owners of the Site, Arnold provided Liberty Mutual with notice of its claim for coverage (the notice is attached as Exhibit 14).

46. Arnold's notice concerned requests for coverage for three lawsuits—the IEPA Suit and two lawsuits filed by individual residents near the Site.

47. Liberty Mutual responded to Arnold's notice with two reservation of rights letters, dated August 12, 2019, and November 20, 2019, in which Liberty Mutual asserted that the Liberty Policies' pollution exclusions may bar coverage for Arnold's claim and requested additional information from Arnold (the "Initial ROR Letters" are attached as Exhibits 15–16).

48. In its Initial ROR Letters, Liberty Mutual agreed to "participate in the defense of Arnold Engineering Co., subject to a reservation of rights." Exhibit 15 at 3.

49. More specifically, Liberty Mutual agreed to defend Arnold under insurance policies issued from January 1, 1976 to January 1, 1978 and from July 1, 1978 to July 1, 1986. Exhibit 15 at 15.

50. However, Liberty Mutual has refused to indemnify Arnold for remediation costs arising from the IEPA Suit or the Consent Order.

51. Through counsel, Arnold sought reconsideration of Liberty Mutual's indemnification position on multiple occasions.

52. For example, on October 16, 2020, Arnold notified Liberty Mutual that compliance with one portion of the Consent Order—the installation of a new wastewater treatment system—would cost Arnold approximately $1.3 million (the "October 2020 Letter" is attached as Exhibit 17).

53. The October 2020 Letter reasserted Arnold's request that Liberty Mutual indemnify Arnold for its remediation costs, including the cost of the new wastewater treatment system.

54. Liberty Mutual responded to the October 2020 Letter on December 22, 2020, and denied that it had any duty to indemnify Arnold under the Liberty Policies due to the pollution exclusions contained therein.

55. Similar back-and-forth exchanges occurred in 2023 and 2024, with Arnold requesting indemnification for various portions of its compliance with the Consent Order, and Liberty Mutual denying any indemnification obligations under the Liberty Policies.

56. On December 3, 2024, Arnold submitted a letter to Liberty Mutual directly rebutting the coverage arguments raised in Liberty Mutual's prior declination letters (the "December 2024 Letter" is attached as Exhibit 18).

57. The December 2024 Letter explained that there is at least ambiguity as to whether the pollution alleged in the IEPA Suit was expected or intended, as defined by Illinois law, so as to trigger an exception to the Sudden and Accidental Pollution Exclusion found in the Liberty Policies. Exhibit 18 at 3–5.

58. The December 2024 Letter also stated that the pollution exclusions found in the Liberty Policies are ambiguous when applied to Arnold's permitted activities at the Site. Exhibit 18 at 5–7.

59. Finally, the December 2024 Letter established that Liberty Mutual's duty to indemnify Arnold was triggered under the personal injury coverage found in certain of the Liberty Policies. Exhibit 18 at 7–10.

60. Liberty Mutual partially responded to the December 2024 Letter with separate letters dated March 6, 2025, and May 1, 2025.

61. In these letters, Liberty Mutual again refused to recognize its duty to indemnify Arnold for the remediation costs arising from Arnold's compliance with the Consent Order.

62. More specifically, Liberty Mutual did not meet its burden to demonstrate that the pollution alleged in the IEPA Suit and the Consent Order was expected or intended, as required under Illinois law.

### Count One—Declaratory Judgment

63. Arnold repeats and realleges paragraphs 1 through 62 hereof, as if fully set forth herein.

64. In this coverage litigation, Arnold seeks a determination of the parties' rights and obligations under the Liberty Policies pursuant to applicable Illinois law.

65. Specifically, Arnold seeks a determination of its right to indemnification, and Liberty Mutual's obligations to satisfy the same, under the Liberty Policies.

66. Arnold's claim for indemnification constitutes a legal, tangible interest in the matter at issue.

67. Arnold does not seek an advisory opinion, as the declaration sought relates to a ripe and present dispute between the parties.

68. Liberty Mutual has expressed an opposing interest in this declaratory action by disputing that it has an indemnification obligation to Arnold under any of the Liberty Policies.

69. As set forth above, none of the reasons set forth in Liberty Mutual's coverage correspondence are sufficient to deny Arnold coverage under the Liberty Policies.

70. The genuine issues concerning the parties' respective rights and obligations under the Liberty Policies would be resolved by a judicial determination of the relevant language in the Liberty Policies.

**Count Two—Breach of Contract**

71. Arnold repeats and realleges paragraphs 1 through 70 hereof, as if fully set forth herein.

72. Liberty Mutual sold insurance policies to Arnold's former corporate parent companies.

73. Arnold is an insured under each of the Liberty Policies.

74. Each of the Liberty Policies constitutes a valid and enforceable contract between Liberty Mutual and Arnold under Illinois law.

75. Arnold has satisfied all conditions precedent to coverage under the Liberty Policies and complied with their terms, including the tendering of payment(s) to satisfy the policy premiums.

76. The grants of coverage found in the Liberty Policies require Liberty Mutual to indemnify Arnold for claims that satisfy the insuring agreement(s).

77. Liberty Mutual has denied that it has any obligation to indemnify Arnold under the Liberty Policies.

78. However, Liberty Mutual has not satisfied its burden to prove the application of the policy exclusions that it has asserted.

79. By refusing to indemnify Arnold, Liberty Mutual is in breach of the Liberty Policies.

80. Arnold has sustained, and will continue to sustain, injury and damages as a result of Liberty Mutual's breach.

81. Specifically, the remediation efforts that Arnold is jointly and severally obligated to undertake at the Site will exceed $4 million.

82. As a result of Liberty Mutual's breach of its indemnification obligations, Arnold will be obligated to pay past costs and to complete the required remediation measures using its own funds.

83. Arnold seeks a judgment in the amount of its final remediation obligation to the IEPA as a party to the Consent Order and any prejudgment interest on any appropriate and applicable amounts as determined by the Court.

**WHEREFORE**, Plaintiff, The Arnold Engineering Co., respectfully requests the entry of judgment as follows:

(1) On Count One, declaring that the pollution exclusions found in the Liberty Policies do not relieve Liberty Mutual of its indemnification obligation to Arnold for the costs associated with complying with the Consent Order's investigation and remediation requirements;

(2) On Count Two, finding that Liberty Mutual is in breach of its indemnification obligations under the Liberty Policies and awarding damages as against Liberty Mutual in the amount of Arnold's final obligations to the IEPA under the Consent Order, plus interest and costs;

(3) Awarding Arnold pre-judgment interest, court costs, expert fees, and attorneys' fees; and

(4) Awarding such other and further relief as the Court deems just and proper.

Dated August 12, 2025	Respectfully submitted,

THE ARNOLD ENGINEERING CO.,

By its attorneys,

*/s/ Lisa C. Goodheart*
Lisa C. Goodheart (BBO No. 552755)
lcg@fitchlp.com
Andrea Studley Knowles (BBO No. 640632)
ask@fitchlp.com
FITCH LAW PARTNERS LLP
84 State Street, 11th Floor
Boston, MA 02109
(617) 542-5542